WILLIAM R. STAPLES and EDWARD D. PEARCE, Trustees, *v.* JULIA L. D'WOLF and others.

The law favors the vesting of estates; and when a gift is made to a person *in esse*, it passes to the legatee, as a vested interest, immediately on the death of the testator; and if there be a prior gift created, determinable upon an event certain to take place, and there be a gift over upon such determination, the last gift will vest with the first, and it will be held that the possession and enjoyment of the gift is postponed, but not the gift itself.

It is a question of intent, to be gathered from the whole will, and the construction would be varied, if, from other parts of the will, it appeared that the testator intended that the gift itself should not take effect until the happening of some event in the future; and the question is, always, is futurity annexed to the substance of the gift? if so, the vesting is postponed; or, is it annexed to the time of payment only? if so, the legacy vests immediately.

The gift of a residue will be construed to be vested; and a very clear intent must be shown to postpone the vesting of it, since intestacy would often be the consequence of the lapse of such a gift, and always may be.

A circumstance from which an intent to vest a legacy may be implied, notwithstanding the only gift is in the direction to pay in the future, is, that the intermediate interest of the legacy is given to the same person.

J. D'W., after making sundry large bequests and devises to his children, disposed of the residue of his property by the following, being the twelfth clause

of his will:—" *Twelfth.* All the rest, residue and remainder of my whole estate, both real and personal, and of every kind and nature whatsoever and wheresoever the same may be situated, lying or being, not herein before disposed of, I give and devise to my executors hereinafter named, in trust, for my aforesaid children, namely, J. D'W., the children of my late daughter, Mary Ann S., taken collectively and not separately, so that the children of my said daughter, Mary Ann, may have their mother's portion were she alive, and no more, Mark Anthony D'W., William Henry D'W., Harriette H., Catharine D'W. D., Nancy B. H., William Bradford D'W. and Josephine M. D'W. L., and to my aforesaid grandson, J. D'W., and their heirs, for the term of twenty years, the rents, issues, incomes and profits or dividends to be paid to my aforesaid children, grandson, and the children of my said daughter, Mary Ann S., in manner aforesaid, and their respective heirs, for said term of twenty years, and to be paid annually; and at the end of said twenty years, the aforesaid property or estate to be divided equally between my said children and grandson, and the children of my said daughter, Mary Ann, taken collectively and not separately, so that they shall have their mother's portion, were she alive, and no more, or their respective heirs, should any of them be dead, share and share alike. And it is further, my will, that my executors, hereafter named, do, and I hereby empower them, to sell and dispose of and convey all my real and personal estate wheresoever situated, which shall form a part of the said rest and residue of my estate, at such time or times, and by public auction or at private sale, for cash or upon credit, as to them shall seem best and most expedient, and until they shall deem expedient to sell the same, to let, lease or demise the same, from time to time, upon such terms, covenants and conditions, and for such times, as they may judge expedient, and to divide and pay the rents, incomes and profits of such real and personal estate, so long as the same shall remain unsold, in the same manner as I have herein before directed with regard to the shares of my aforesaid children and grandson; and I also will and direct that the sixty thousand dollars of stock in the Bank of Bristol, herein before appropriated to raise the semi-annual payment to my said wife, shall, on the death of my said wife, fall into and make part of my residuary estate, and be appropriated as herein directed in relation to such residuary estate. So, also, in case my said wife shall elect to take her dower in my estate, instead of the provision herein before made for her." He further directed as to the residue, by the following, being the sixteenth clause of his will:—" *Sixteenth.* And whereas, in relation to the residue of my estate mentioned in the twelfth clause of this my will, I have prescribed an appropriation of said residue in such a way as that the rents, issues, profits and interests of said residue shall be divided equally and among my children, my grandson, and the children of my late daughter, Mary Ann, taken collectively, and to their heirs, as will appear on reference to said clause: now my intention is, and I therefore will, that the children of my said children, and of any one of my said children, and the heirs of my said children, and any one of my said children, shall only take the share of his, her or their parent or parents, and such portion of said residue, and the rents, issues, profits and interest thereof, as such parent or parents would have taken if alive, it being my intention that my grand-children and the heirs of my said children, and each of my children, shall only take the portion of him, her or them, from whom he, she or they may take, receive or inherit, the division to be made *per stirpes* and not *per capita.*" *Held,* that the several shares in the residuary estate vested in the several legatees, on the death of the testator, absolutely, in fee simple,—to be paid out and divided amongst them at the end of twenty years; and that the children of

the legatees were not entitled, in any event, to claim any portion of the residue as purchasers under the will.

JAMES D'WOLF, a citizen of Bristol, in the State of Rhode Island, possessed of a very large property, and having a family composed of eight children, and of grand-children, the issue of two deceased children, made his last will and testament, by which he disposed of all his property, and of all rights of property to which he might be entitled at the time of his decease. He did not leave the partition of his estate to be made by his executors and devisees, but by far the greater portion of it was devised specifically,—the testator making the division by such specific devises. A considerable portion of his estate remained undisposed of, after these specific devises; and this residue, which consisted of property invested in different States and countries, and of very uncertain and fluctuating value, he disposed of, in one mass, by the twelfth clause,—giving further directions as to the division of the residue, and of the income thereof, by the sixteenth clause,—of his will.

The executors (who were also made trustees of the residue) named in the will, were James D'Wolf, Jr., Mark Anthony D'Wolf, William Henry D'Wolf and William Bradford D'Wolf, sons of the testator, and Jonathan Prescott Hall, his son-in-law. The will was proved in 1837, and James D'Wolf, Jr., and Mark Anthony D'Wolf,—the others renouncing,—qualified, and took upon themselves the office of executors and trustees, and continued to act as joint executors and trustees until December 2d, 1839, when James D'Wolf, Jr., was removed from his office of executor and trustee by a decree of the Court of Probate of Bristol, after which Mark Anthony D'Wolf continued to act as sole executor and trustee until his death, in 1851. In that year, and after the death of said Mark Anthony D'Wolf, William Bradford D'Wolf accepted his appointment as executor and trustee, and entered upon the duties thereof.

In 1857, at the September term of the Supreme Court for Bristol county, William Bradford D'Wolf, acting trustee, filed his bill in equity against those of the *cestuis que trust* named in the will of James D'Wolf, who were living, their children, the chil-

dren of those who were dead, and against various parties claiming title in the residuary estate under mortgages, assignments, and transfers from some of said *cestuis que trust*, or their grantees. The bill was afterwards amended, by the addition of other parties, claiming title as aforesaid. The suit was, by order of court, on the agreement of the parties, removed to Providence county for hearing. Answers were filed by the various parties defendant. During the pendency of the cause, Francis LeBaron D'Wolf, a son of Mark Anthony D'Wolf, died, and the suit was revived as against his administratrix, widow and heirs. In 1862, William Bradford D'Wolf died. The trustees, named in the will of James D'Wolf, were all dead, or had declined to act, or had been removed. A bill was filed in Bristol county, by the executors of said William Bradford D'Wolf and others, against Robert L. Cutting, his wife, and others, praying for the appointment of new trustees, under the will of said James D'Wolf. After due proceedings had, William R. Staples and Edward D. Pearce were duly appointed new trustees, by decree of the court, which decree vested the residuary estate in them. Conveyances were executed by the various parties in interest, in accordance with the requirements of the decree, and subsequently, at the March term of this Court, 1863, said new trustees filed a supplemental bill against all the parties to the original bill, against the executors of William Bradford D'Wolf, and against all other parties known to the new trustees, who had, or claimed, since the original bill had been filed, to have acquired an interest in said residuary estate. To this supplemental bill answers were filed by the various defendants. During the pendency of the supplemental suit, Harriette D'Wolf Hall, one of the said defendants, died, and the said suit was revived as against her executor, who filed his answer.

James D'Wolf, Jr., was removed from the office of executor and trustee, in 1839, in consequence of his having appropriated and converted to his own use the sum of $28,779.45, of the funds of the said residuary estate held by him as trustee thereof. Mark Anthony D'Wolf, his associate trustee, at or about the time of his, the said James's, removal from his said office, released and

discharged him from the said balance of account, and the said James, at the same time, by two instruments, released and conveyed all his interest in the said residuary estate to said Mark Anthony D'Wolf, for the benefit of the devisees, himself excepted, of said residuary estate, mentioned in the twelfth and sixteenth clauses of the will of James D'Wolf, testator, heretofore referred to, saving his interest in and to an estate in the island of Cuba, known as the New Hope estate, one-half of which had been specifically devised to Mark Anthony D'Wolf, and the other half, by force of the will, fell into and became part of, the residuary estate. By another conveyance, made at the same time, the said James conveyed his individual interest in the New Hope estate to said Mark Anthony D'Wolf, for his own and his heirs' proper use, benefit and behoof, and by another instrument of the same date, he conveyed his interest, as executor and trustee, in and to said New Hope estate, to said Mark Anthony, trustee, for the benefit of the *cestuis que trust* named in the will, himself excepted. These instruments are annexed as exhibits to the original bill. On the same date at which the above described instruments were executed, Mark Anthony D'Wolf purchased of all the other *cestuis que trust* named in the will of James D'Wolf, all of whom were living, their and each of their right, title and interest, in and to the New Hope estate, and thereafter held the whole of said estate as his individual property, and not as a trust estate, or as part of the residuary property. Josephine M. Lovett, who was one of the *cestuis que trust* named in the will of James D'Wolf, and her husband, Charles W. Lovett, conveyed, July 21st, 1851, to J. Russell Bullock, their interest in the residuary estate, and said Bullock, May 3d, 1854, conveyed the same to William Bradford D'Wolf, trustee, to be by him held in trust, for the benefit of the parties entitled to the same under the twelfth and sixteenth clauses of said will. The original bill filed by William Bradford D'Wolf, deceased, also contained an allegation concerning certain entries in the books of James D'Wolf, the testator, relating to a house and lot in Bristol, and to a credit of a sum of money on account thereof, and, on this allegation, the complainant based a prayer to the effect

Staples and Pearce, Trustees, *v.* D'Wolf and others.

that he might be allowed to retain the said sum, with interest, for his individual benefit. By reason of his death, however, his executors were made parties defendant to the supplemental bill. No proof was submitted upon this statement, it being left as a matter to be determined between the new trustees and the estate of the old one, in other proceedings.

The new trustees, as did the old one, came before the court for instructions, as to the manner in which, and the parties to whom, the fund now in their hands should be distributed, and prayed, in substance, as follows:—

*First.* That the rights and interests of the various parties interested in the trust fund may be ascertained and declared, by the decree of the court.

*Second.* That it may be ascertained, in relation to the New Hope estate, whether Mark Anthony D'Wolf, under the conveyances set forth in the bill, took and received an estate in fee simple in said estate, or only an estate for the respective lives of the grantors.

*Third.* That the court will give all necessary instructions for carrying the trusts of the will into execution.

The two clauses of the will of James D'Wolf, upon which the questions raised by the parties turned, were the *twelfth* and *sixteenth*.

The twelfth clause of the will of James D'Wolf was as follows:

" All the rest, residue and remainder of my whole estate, both real and personal, and of every kind and nature whatsoever, and wheresoever the same may be situated, lying or being, not herein before disposed of, I give and devise to my executors, hereinafter named, in trust, for my aforesaid children, namely, James D Wolf, the children of my late daughter, Mary Ann Sumner, taken collectively and not separately, so that the children of my said daughter, Mary Ann, may have their mother's portion, were she alive, and no more, Mark Anthony D'Wolf, William Henry D'Wolf, Harriette Hall, Catharine D'Wolf Dodge, Nancy B. Homer, William Bradford D'Wolf and Josephine M. D'Wolf Lovett, and to my aforesaid grandson, James D'Wolf, and their heirs,

for the term of twenty years, the rents, issues, incomes and profits or dividends, to be paid to my aforesaid children, grandson and the children of my said daughter, Mary Ann, in manner aforesaid, and their respective heirs, for the said term of twenty years, and to be paid annually, and, at the end of said twenty years, the aforesaid property or estate to be divided equally between my said children, and grandson, and the children of my said daughter, Mary Ann, taken collectively and not separately, so that they shall have their mother's portion, were she alive, and no more, or their respective heirs, should any of them be dead, share and share alike. And it is, further, my will, that my executors, hereinafter named, do, and I hereby empower them, to sell and dispose of, and convey all my real and personal estate, wheresoever situated, which shall form a part of the said rest and residue of my estate, at such time or times, and by public auction, or at private sale, for cash or upon credit, as to them shall seem best and most expedient, and, until they shall deem expedient to sell the same, to lease, let, or demise the same, from time to time, upon such terms, covenants and conditions, and for such times, as they may judge expedient, and to divide and pay the rents, income and profits of such real and personal estates, so long as the same shall remain unsold, in the same manner as I have herein before directed, with regard to the shares of my aforesaid children and grandson; and I also will and direct, that the sixty thousand dollars of stock in the Bank of Bristol, herein before appropriated to raise the semi-annual payments to my said wife, shall, on the death of my said wife, fall into and make part of my residuary estate, and be appropriated as herein directed, in relation to such residuary estate. So, also, in case my said wife shall elect to take her dower in my estate, instead of the provision herein before made for her."

The sixteenth clause of his will directs as follows:—

"And whereas, in relation to the residue of my estate, mentioned in the twelfth clause of this, my will, I have prescribed an appropriation of said residue in such way, as that the rents,

issues, profits and interests of said residue shall be divided equally, and among, my children, my grandson, and the children of my daughter, Mary Ann, taken collectively, and to their heirs, as will appear on reference to said clause. Now my intention is, and I therefore will, that the children of my said children, and of any one of my said children, and the heirs of my said children, and any one of my said children, shall only take the share of his, her or their parent or parents, and such portion of said residue, and the rents, issues, profits and interest thereof, as such parent or parents would have taken if alive, it being my intention that my grandchildren, and the heirs of my said children, and each of my children, shall only take the portion of him, her or them, from whom he, she or they may take, receive or inherit, the divisions to be made *per stirpes* and not *per capita.*"

The case was heard upon the bill and answers, and was submitted upon written arguments.

*Parsons, for the trustees,* stated the case, and the several questions raised by the bill and answers.

*T. A. Jenckes, with whom was R. W. Greene, for James D' Wolf Perry and others:*—

I. The children and grandchildren of James D'Wolf, named in the twelfth clause of his will, took absolute vested interests in the whole residuary estate, both income and capital. 1. The law favors the vesting of estates, and, as a will takes effect at the death of the testator, it follows that a devise in favor of a person *in esse* confers an immediately vested interest. And where a testator creates a prior estate, and then goes on to dispose of the ulterior interest expressly, in an event which will determine the prior estate, the words descriptive of such event, occurring in the latter devise, will be construed as referring merely to the period of the determination of the possession or enjoyment under the prior gift, and not as designed to postpone the vesting. 1 Jarman on Wills, 727 ; 2 Williams on Executors, 1051 ; 1 Roper on Legacies, 557. The question, whether or not a legacy vests in interest immediately on the death of the

testator, is a question which depends on the intention of the testator, and that intention, however inartificially expressed, is to govern. But this intention must be in accordance with the rules of law, and to ascertain it in cases where a future time is defined for the payment of the legacy, positive rules of construction have been established. The question always to be determined in such cases is, in itself, perfectly simple, and is this:—Is time annexed to the payment of the legacy, or to the legacy itself? 2. The first rule of construction is this:—That a bequest to a person, *payable*, or *to be paid*, at or when he shall attain the age of twenty-one, or at the end of any other certain determinate term, confers on him a vested interest immediately on the testator's death, as *debitum in præsenti solvendum in futuro*, and transmissible to his executors or administrators; for the words, "payable" or "to be paid," are supposed to disannex time from the gift of the legacy, so as to leave the gift immediate, in the same manner as if the bequest stood singly and contained no mention of time. *Jackson* v. *Jackson*, 1 Ves. Sen'r, 217; *Sydney* v. *Vaughan*, 2 Brown's Parl. Cas. 254; *Farmer* v. *Francis*, 2 Sim. & Stu. 505; *Packham* v. *Gregory*, 4 Hare, 396; 2 Williams on Executors, 1052–3; 1 Roper on Legacies, 554; 1 Jarman on Wills, 733 *et seq*. The rule has been stated generally, by Lord Loughborough, to be this: If the day is certain, the legacy is vested; but where it is uncertain, the question will be, whether it is in the nature of a condition; for if it is conditional, then, in the very nature of the thing, the time is annexed to the substance of the gift, as in the case of marriage, puberty, or any other situation in life when the arrival of the time is a condition, without which the testator would not have made the gift. *Monkhouse* v. *Holmes*, 1 Bro. Parl. Cas. 298; see, also, *Barnes* v. *Allen*, 1 Ib. 181; *May* v. *Wood*, 3 Ib. 473. Where the words of a will are in the present tense, but the direction for the payment is in the future, the fair import of the language is, that there is a present gift to be paid hereafter. A direction in a will for the division of an estate among several persons, by the executor, is equivalent to a direction for the payment to the legatees of their respective shares; in such a case, the interest is vested and transmissible. See note to *Leeming* v.

Staples and Pearce, Trustees, *v.* D'Wolf and others.

*Sherratt*, 2 Hare, 14, citing *Packham* v. *Gregory*, *ubi sup. ;* and see, as to the general operation of the rule, *Yearwood* v. *Yearwood*, 9 Beav. 327 ; *Parkin* v. *Wright*, 15 Sim. 83 ; *Lyon* v. *Coward*, 15 Ib. 287 ; *In re Thompson's trust*, 15 Eng. Law and Eq. 498 ; *King* v. *Isaacson*, 17 Ib. 456 ; *Hodgson* v. *Smithson*, 25 Ib. 245 ; *Kidd* v. *North*, 27 Ib. 481–2. It would scarcely seem necessary to go further than the citation of the first rule, and the cases to which it has been applied, to decide upon the construction of the twelfth clause of this will. All the conditions required by the rule are fulfilled. The words of the gift are in the present tense, the direction for the division being in the future. It is submitted that the only proper construction of this language is, that the enjoyment alone of the capital of the estate, by the parties named, is postponed for twenty years, and that the interest vested on the death of the testator. 3. The case is, in no manner, affected by the exceptions to the rule. The principal of these exceptions, and the only one now necessary to consider, is this :—That the rule itself is always subservient to the intention of the testator, and if, therefore, on construing the whole will, it clearly appears that the testator meant the time of payment to be the time when the legacy should vest, no interest will be transmissible to the executors or administrators, if the legatee dies before the period of payment, although the words, "payable at" or "to be paid," or other terms of immediate gift, be employed in the will. 1 Roper on Legacies, 558, *et seq. ;* 2 Williams on Executors, 1054. The question of the general intent of the testator will be more fully considered hereafter. It is now proposed to show the mode of operation of the exception just stated. Thus : property was bequeathed to trustees, the interest to be applied to the maintenance of the testator's children, a specific sum to be paid on each attaining the age of twenty-one, and the overplus to be equally divided between such of the children as should be living when the youngest attained twenty-one. All became twenty-one, but one died before the youngest attained that age, and it was of course held, that the child so dying took no vested interest in the share of the overplus. *Homes* v. *Herring*, 1 M'Clel. and Yo. 295. The very obvious distinction be-

tween the case cited and the class to which it belongs, and the one at bar, need not be more particularly pointed out. See cases cited in 1 Roper on Legacies, 559. And it is to be remarked, that it is a rule, controlling this exception, that the intention of the testator to postpone the vesting must be clearly expressed, and with certainty and precision, or the general rule will operate; and that intention cannot be derived from ambiguous words. It must be inferred, where the time fixed for the payment of a legacy *is certain*, the testator merely postponed the payment of the legacy. 2 Williams on Executors, 1054; 1 Roper on Legacies, 561–2. 4. "The construction which reads words that are seemingly creative of a future interest, as referring merely to the futurity of possession occasioned by the carving out of a prior interest, and as pointing to the determination of that interest, and not as designed to postpone the vesting, has obtained, in some instances, where the terms in which the posterior gift is framed import contingency, and would, unconnected with, and unexplained by, the prior gift, clearly postpone the vesting. Thus where a testator devises lands to trustees until A shall attain the age of twenty-one years, and if, or when he shall attain that age, then to him in fee, this is construed as conferring on A a vested estate in fee simple, subject to the prior chattel interest given to the trustees, and, consequently, on A's death under the prescribed age, the property descends to his heir at law; though it is quite clear, that a devise to A, if or when he shall attain the age of twenty-one years, standing isolated and detached from the context, would confer a contingent interest only." 1 Jarman on Wills, 734, and cases there cited; and see, as to this construction and its application to legacies, 2 Williams on Executors, 1067, and cases cited; see, also, *Hayward* v. *Whitby*, 1 Burrow, 228; *Satterthwaite* v. *Satterthwaite*, 1 W. Black. 519; *Wright* v. *Cundall*, 9 East. 400. The words of this twelfth clause are, "all the rest, residue and remainder of my whole estate, both real and personal, I give to my executors, in trust, for my children," &c., "and their heirs, for twenty years, the income to be paid annually to them and their respective heirs; and at the end of said twenty years, the aforesaid property to be equally divided be-

tween them, or their respective heirs should any of them be dead," &c. It is submitted, that, in view of the principles established by the law just cited, this language cannot be held otherwise than to have vested the interest of the parties named in the clause in the whole residue, both income and capital, immediately on the death of the testator, James D'Wolf.

II. By the twelfth clause of the will of James D'Wolf, the trustees of the residue of his estate are directed to hold said residue, and to pay the interest and income thereof, annually, to the parties named in said clause, during twenty years, at the end of which time the aforesaid property is to be divided equally among said parties, or their respective heirs, should any of them be dead. The *corpus* of the residue being thus held by said trustees, during the time limited, for the benefit of said parties, the interest of the latter in the whole property, both income and capital, must be held to have vested immediately on the death of the testator. The second rule of construction adopted by courts for their government, in ascertaining the intention of the testator in cases where a future time is defined for the payment of the legacy, is this:—That if the words "payable" or "to be paid" are omitted, and the legacies given *at* twenty-one, or *if, when, in case,* or *provided,* the legatees attain twenty-one, or any other definite period, these expressions annex time to the substance of the legacy, and make the legatee's right to it depend on his being alive at the time fixed for its payment; consequently, if the legatee happens to die before that period arrives, his personal representatives will not be entitled to the legacy. *Onslow* v. *South,* 1 Eq. Cas. Abr. 6; *Cruise* v. *Bailey,* 3 P. Wms. 20; *Smell* v. *Dee,* 2 Salk. 416; 2 Williams on Executors, 1052–3; 1 Roper on Legacies, 566. There is, however, an important exception to the second rule of construction, which is embodied in the words of this second point. In cases where the legacy is given at some period, and the *interim* interest is to be paid by trustees, who hold the property, to the legatee, or for his benefit, words which may impart a condition precedent to the vesting of the legacy, will not be permitted to have that effect; on the contrary, they will be considered as merely descriptive of the

Staples and Pearce, Trustees, v. D'Wolf and others.

*time* when the legatee was to be let into the possession of the fund, and then, according to the first rule of construction, the legacy will vest, at the death of the testator, and if the legatee dies before the time limited, his personal representative will be entitled to the legacy. And this applies equally to cases where the income of property is given for the support and maintenance of legatees, and where it is given for their benefit generally. 2 Williams on Executors, *ubi sup.*; 1 Roper on Legacies, 578; *Fonereau* v. *Fonereau*, 3 Atkyns, 645; *Hanson* v. *Graham*, 6 Vesey, 245; *Hoath* v. *Hoath*, 2 Bro. C. C. 4; *Parker* v. *Golding*, 13 Sim. 418; *Lane* v. *Goudge*, 9 Ves. 224; *Branstrom* v. *Wilkinson*, 7 Ib. 421; *Murray* v. *Addenbrook*, 4 Russ. 407; *Vivian* v. *Mills*, 1 Beav. 315; *Davis* v. *Fisher*, 5 Ib. 201; *Milroy* v. *Milroy*, 14 Sim. 48. In view of these authorities, and the principle which they declare and which governs them, the interest of the parties in the twelfth clause of the will of James D'Wolf must be held to have vested on the death of the testator, even should that interest be held not to have vested under the first rule of construction. If the first point taken be untenable, it might be sought to make the vesting of the residue contingent, by claiming that, by the language of this clause, the testator intended to make the gift of the income a separate and independent gift from that of the *corpus* or capital of his residuary estate. Dividends and income are undoubtedly the objects of distinct gifts, wholly independent of the capital. But, in such cases, the intent of the testator so to separate them must be clear and distinct, and the language expressing that intent must be unambiguous, and free from all doubt. *Batsford* v. *Kebbell*, 3 Ves. 363; Roper on Legacies, 582. But it is submitted that the class of cases, of which *Batsford* v. *Kebbell* is an example, differs widely from the case at bar. For, in each of those cases, an immediate particular gift of the dividends alone is first made, and *then* the gift of the fund is made to depend on an expressed contingency, the intent being to bring the object of the second gift within the operation of the second rule of construction. But in the case at bar, not only are the words "to be paid," "to be divided,"—and "there is no magic in the words ' pay ' and ' divide,' " says Wigram, V. C. (in

*Packham* v. *Gregory, ubi sup.*),—used so as to bring it clearly within the operation of the first rule of construction; but the whole rest, residue and remainder is given to the legatees and their heirs, through trustees, who hold it, for a time, for the benefit of said legatees, immediately, in express terms, in the present tense; and this large, plain and particular disposition of the whole rest, and residue, is made first and before any direction is given for the annual payment of the income. "*All the rest, residue and remainder* of my whole estate, I give and devise to my executors, in trust, for *my children*," &c., "*and their heirs;* the income to be paid to them and their heirs annually, and, at the end of twenty years, the aforesaid property to be equally divided," &c. If we are to give to plain words their plain signification, the interest of the parties named in the twelfth clause of this will, on both income and capital, must be held to have vested on the death of the testator.

III. The twelfth clause of the will of James D'Wolf disposes of the residue of the testator's estate, and being the gift of a residue, the interest therein of the parties named in said clause must be held to have vested on the death of the testator. "If there is any case which decides, as an abstract proposition, that a gift of a residue to a testator's children, upon an event which afterwards happens, does not confer on those children an interest transmissible to their representatives, merely because they die before that event happens, I am satisfied that case must be at variance with the authorities." By Wigram, V. C., *Leeming* v. *Sherratt*, 2 Hare, 23. It is an unquestioned rule, in the construction of wills, that a bequest of the residue of an estate will always be construed to be vested, for the purpose of preventing an intestacy. *Booth* v. *Booth*, 4 Ves. 399 ; *Jones* v. *Mackilwain*, 1 Russ. 220 ; *Leake* v. *Robinson*, 2 Meriv. 386. But it may be said that, by the use of the word "*heirs*" in the twelfth clause of his will, the testator has provided against such a possibility. And this brings us at once to the question of the construction of the word "*heirs*," as used in this clause. I give this residue "to my executors, in trust, for my children," &c., "*and their heirs.*" The rents, issues, incomes and profits to be paid annually to said

children, &c., "*and their respective heirs.*"    At the end of twenty
years, the aforesaid property or estate already disposed of, "to
be divided equally between them *or their respective heirs*, should
any of them be dead, share and share alike."    The word is thus
used in this clause.    What is its signification ?    How shall it be
construed ?    Let it be remembered, first : that the language of
this clause, brings the bequest therein made, *in terms*, within the
operation of the first rule of construction, already fully cited.
Second : that even should it be held that it is not within the
operation of that rule, it is yet the bequest of a fund, the interest
of which is to be applied for the benefit of the legatees named,
and the principal subsequently to be paid to them, and it thereby
becomes vested on the death of the testator.    Third : it is the
bequest of residue, and as such, *prima facie*, must be held to
have vested on the death of the testator.    Bearing these in
mind, there can be no difficulty in the construction to be put
upon the word as used in this clause.    If by the words—"I
give this residue to my children," &c., "and their heirs,"—the
interest of the children, &c., was vested in that residue on the
death of the testator, it will not be necessary to go further.    And
if the interest has already vested, the word cannot, of course,
be a word of purchase.    Were the interest bequeathed by this
clause to the children to be regarded as real estate, the word
*heirs*, by analogy to the rule in Shelley's case, would be a word
of limitation.    And as to personal property, "it may be observed
that it is an established rule of construction with respect to wills
of personalty, that where personal estate is given in terms which,
if applied to real estate, would create an estate tail, the property
so bequeathed vests absolutely in the first taker, and conse-
quently devolves, at his death, on his executors and administra-
tors, whether he has issue or not."    2 Williams on Executors,
949 ; 4 Kent's Com. 537, note *a ;* 2 Jarman, 2, and cases cited
in each work.    It may be urged, however, that upon the general
principles of construction, every word must be deemed to have
been used for some purpose, and its effect must, if possible, be
given to it ; and therefore, this word "*heirs*" must have a mean-
ing.    Unquestionably, it has a place and a meaning in this clause

of the will, which fully accords with the intent of the testator, according to the construction which it is herein submitted should be put upon the clause. · It is used, as it is very often used by testators, simply to designate the persons to whom the legacy shall be paid. He first gives his children, and their heirs, the whole residue, in terms too clear to be misconstrued; he directs the income to be paid to them and their respective heirs; and then, to show more ·clearly and distinctly, if possible, that he intended the gift already made to be absolute, vested, indefeasible, he, a third time, designates the objects of his bounty, as his legatees already named, " or their heirs," &c. There is no more magic or mystery in these words than Vice Chancellor Wigram found in " pay " and " divide." The word *heirs* is not used to prevent a lapse ; for, a vested estate having been previously created, a lapse was impossible. It is clear that it was used simply to fix beyond doubt the vesting of the interest, by designating the persons who were to take when the time, to which the payment of the legacy already vested was postponed, had arrived. But further :· it may be contended that, by reason of the use of words, " *or their heirs, should any of them be dead,*" the heirs of the parties named in this clause of the will, will take by substitution for the direct objects of the gift. *Girdlestone* v. *Doe,* 2 Sim. 225 ; *Price* v. *Lockley,* 9 Beav. 180; *Leeming* v. *Sherratt,* 2 Hare, 23; *Gittings* v. *McDermott,* 2 M. & K. 69; *Doody* v. *Higgins,* 9 Hare, app. xxxii; *Jacobs* v. *Jacobs,* 16 Beav. 557; *In re Craven,* 23 Ib. 333;—all of which illustrate the same principle. But the distinction between these cases and the one at bar cannot fail to be at once observed. The principle on which they rest is, that other parties are, in express words, *directed to be substituted,* as in *Leeming* v. *Sherratt;* and the substitution must be confined to those so directed to be substituted, or,—and this is most important,—by the language of the will, according to the settled rules of construction, *no estate vested in the ancestor.* They are, on terms, so far as the vesting is concerned, brought within the operation of the second rule. The bequest was not to take effect till *after* the event or period named had happened or arrived. Time entered into the essence of the gift, and the

heirs took, by substitution, because, when the estate came to vest, they were fixed upon so to take.   But again: the authority of the case of *Girdlestone* v. *Doe, ubi sup.*, has been doubted, and the doubt thrown upon it expresses precisely the distinction between the cases to which the doctrine of substitution applies and those to which it does not.   "His Honor's argument, from the context, as reported, does not appear conclusive.   When the testator intended to give a life interest, he used suitable words in the bequests to M. T., and the inference is strong, that in the bequests to *I. H. or his heirs*, he intended to give the absolute interest, using 'or' for 'and.'   A devise of real estate to *A. or his heirs* passes the fee."   2 Roper on Legacies, 1414, 1410, and cases cited, particularly *Wright* v. *Wright*, 1 Ves. Sen'r, 409, and *Read* v. *Snell*, 2 Atk. 645.   Even, therefore, did these words stand alone, and were the bequest held to be a separate gift of the capital of the estate, it may well be doubted whether, under the authorities cited, such bequest to these legatees *or their heirs* would not give a vested estate to each legatee, "or" being construed "*and.*"   See *Lachlan* v. *Reynolds*, 15 Eng. Law and Eq. 234; *In re Walton's Estate*, 35 Ib. 589.   But the case does not rest here. On general rules, a large, plain and particular disposition, before expressed, is not to be altered by a word or phrase which, taken alone, might alter the general disposition; and words repugnant to a clear intent, clearly expressed, will be rejected as surplusage. 1 Jarman on Wills, 411, *et seq.*   The word *heirs* is, as we have seen, used three times in the twelfth clause of this will.   It cannot be denied, that a gift of personalty to A. and his heirs gives an absolute interest.   Words are to have their legitimate and ordinary import, when that import does no violence to the clear intent of a testator.   Is there, by the terms of this clause, in its words as they stand, attaching to them and each of them their ordinary signification, leaving wholly out of view the rules of construction, already fully cited, and doing no violence to any intent of the testator, express or implied, an absolute gift of this residue, capital and income?   The clause answers for itself. "*All* the rest, residue and remainder of my whole estate, I give to these trustees for my children, &c., *and their heirs*.   The income

Staples and Pearce, Trustees, *v.* D'Wolf and others.

is to be paid annually to them *and their respective heirs.* At the end of twenty years, the *aforesaid property* to be divided between them, *or their heirs."* It is respectfully submitted, that it would be a most forced and unnatural construction of this language, which would make out of it two distinct gifts, and, that being done, would postpone the vesting of the second gift for twenty years. Both the ordinary signification of language, and the rules of law, fully sustain the construction contended for.

IV. The construction contended for is strengthened and confirmed by the sixteenth clause of the will. This clause only explains more fully the intention of the testator, as to the manner in which the division of the capital of the residue is to be made among those who before, as regards the income, and at the period to which the division of the capital has been postponed, shall be qualified to take,—not the children only, but the children of the children, and the heirs (using the word in its general sense) of the children, or any one of the children. The clause is as though he had said : I have already given each of the parties named in the twelfth clause of my will a vested interest in the residue of my estate, the income to be paid annually, and the capital to be divided equally between them at the end of twenty years. Now, I wish it to be understood, that, during that period, the interest, should any one die, and, at the end of that period, the capital, is not to be divided in such a way that those who may be qualified to take the share of the one so dying, shall each, if there are more than one so qualified, take equally with the legatee named and living ; but if one die, those who may be qualified to take, in his or her place, shall only take *collectively* the share of the legatee named in the twelfth clause (that share being already vested in the legatee) " from whom he, she or they, may *take, receive or inherit."* I name ten parties as legatees in the twelfth clause. My residuary estate is to be divided *in tenths* among those entitled to it ; *per stirpes,* therefore, and not *per capita.* See *Minchell* v. *Lee,* 21 Eng. Law and Eq. 21. There can certainly be no ambiguity or obscurity in this clause, still less can there be any doubt as to its plain construction.

Staples and Pearce, Trustees, *v.* D'Wolf and others.

V.   The construction contended for is in accordance with the intent of the testator, as gathered from the whole will.   Perhaps, as throwing some light on the question—whether or not the gift of the capital of the residuary estate, in the twelfth clause of this will, is a gift which is to vest in the legatees named only on condition that those legatees should be alive at the end of twenty years—the fourteenth clause may be referred to.   That clause undeniably makes it a condition of the vesting of an estate in the party therein named, that he shall live to be twenty-four. As was remarked, in the criticism on the opinion in *Girdlestone* v. *Doe*, cited above, " when the testator intended only to give a life-interest he used suitable words, and the inference is strong," &c., so when James D'Wolf intended to make time the essence of a gift, he used suitable words, as in the fourteenth clause, and that clause exhibits his mode of expression when such is his intention.   *As exhibiting that*, it certainly may have some bearing on the intent, as shown in the twelfth and sixteenth clauses. " The inference may be strong " in this case, as in the one cited. But from *the whole will*, its plan and purpose, what are we to consider the intent of the testator with reference to the residue of his estate ?   After an examination of this will, it does not seem difficult to understand the views with which James D'Wolf came to consider the question, how he should dispose of the residue of his immense estate.   Each child and deceased child's children had been largely and amply provided for, by specific bequests, and still a vast amount remained.   The same children and grandchildren, for whom he had provided, were yet the objects of his bounty, but to leave the remaining property, in undivided shares among them, would, from the diverse nature of the property itself, and scattered, as it was, from the number of parties in interest, and from various other causes which at once suggest themselves, lead to infinite trouble and vexation. He, therefore, wisely said : " This vast remaining estate, consisting of almost every species of property, cannot even be collected together, much less settled or divided, within the time ordinarily required for the settlement of estates.   I desire that the same parties to whom I have already given shall have this also, and

Staples and Pearce, Trustees, *v.* D'Wolf and others.

to that end, giving the least cause for trouble, for the benefit of my children and grandchildren, as well as that of the estate, I will give it to them and their heirs now, but I will control it by a trust. It shall remain, for twenty years, in the hands of my executors, as trustees. They shall manage it for the benefit of my children and grandchildren, and shall annually pay the income to them and their heirs. During that period, these trustees shall collect the property together, shall judiciously sell and dispose of it, converting the whole of it, real, personal and mixed, into money, and, at the end of the twenty years, that money is to be divided among my children and grandchildren, whom I name, and to whom, thus and *now*, I give it." Twenty-three years have passed since this will was proved, and, to-day, the accounts of the trustees are not settled, nor the property all sold and converted into money. This result clearly shows that this testator might have fixed, with propriety, even a longer period than twenty years, for the duration of the trust. By the rules of construction, therefore, by the clear intent of the testator, as expressed in the twelfth clause of his will, as strengthened and confirmed in the sixteenth clause, and as gathered from and made manifest by the whole will, the construction contended for should be sustained.

*Currey, for Mrs. Bedlow :—*

I.   A vested interest in the devisees would be incompatible with the powers and duties of the trustees. The rights and powers of trustees ought to be commensurate with their obligations and duties. The obligations and duties of these trustees are particular and positive. They are clearly defined and imperative. The language of the testator clearly shows their character, and the importance which he attached to them. "And it is, further, my will, that my executors do, and I hereby empower them, to sell and dispose of, and convey all my real and personal estate, wherever situated, which may form a part of the said rest and residue of my estate, at such time or times, and by public auction or by private sale, for cash or upon credit, as to them shall seem best and most expedient." This, the court will perceive, is a positive direction to convert the entire residuary

estate into personalty, before distribution.    The trustees have not merely a passive trust, to hold and convey ; they are to hold and occupy.    They are, "from time to time, to let, lease and demise, upon such terms and conditions, and for such *times* as they may judge expedient."    Neither the intent nor the effect of these directions can be mistaken.    The direction, "it is, further, my will, that my executors do," is positive ; the authority, "and I hereby empower them," is absolute ; and the time, "at such time or times as to them shall seem best and most expedient," is any time during the full period of the trust term.    But how could the trustees have the power, and be absolutely required, to sell and convert into personalty, or otherwise hold and occupy the estate, at any and all times up to the end of the term, if the equitable owners took an absolute interest in the gift ?    If they took an absolute interest, they might always interpose to prevent a sale and conversion, and even put an end to the trust altogether, at their pleasure.    Surely, these two things are quite incompatible.    And if they are so, can we believe the testator intended to create such a repugnancy ?    Must we not rather seek for a construction that will reconcile the rights of the one party, whatever they are, with the manifest powers and duties of the other party ?    But the powers and duties of the trustees are too express and positive to yield to construction.    The trust term is absolute ; it extends to the full expiration of twenty years.    The direction to sell is absolute, and the duty imperative.    On these points all is clear, without and above argument.    We cannot say this of the gift.    No one will say it is clearly a vested interest.    At best, that is a matter of argument and construction, for it cannot be denied but that it is coupled with words of futurity, and has an aspect of contingency. Just in proportion, therefore, as the admission of a claim, resting in doubt and uncertainty, would tend to defeat the clear and positive will and direction of the testator, is the weight and preponderance of the argument against the intention of a vested interest in the capital of the gift.    *Pearson* v. *Lane*, 17 Ves. 101 ; *Joslyn* v. *Joslyn*, 9 Simons, 63 ; Lewis on Trusts, 495.

II.    I will next consider the gift itself.    The *first* thing to be

observed of this residuary devise is, that it consists of two gifts; first, a gift of the income of the fund; and, secondly, a gift of the fund itself. These two gifts are, in all legal respects, entirely distinct and independent, though, from the necessary connection between an income and the fund from which it is derived, and because both gifts are primarily to the same persons, the mind is apt to imagine other relations between them. In reality, they are no less independent of each other, than if the income payments were to be derived from some other fund, and the devisees of the one and the other were different persons and strangers. The gift of the income vested in immediate interest, payable annually, for the term of twenty years, and was thereupon to determine. The gift of the fund itself was, in all essential respects, entirely different. The first point of difference is, that it was a future gift, being to take effect only when the gift of the income was to come to an end. This is the necessary legal effect of the testator's language. The language is, "and at the end of said twenty years, the aforesaid property or estate to be divided equally between my said children and grandson, and the children of my said daughter, Mary Ann, taken collectively and not separately, so that they shall have their mother's portion, were she alive, and no more, or their respective heirs, should any of them be dead." This comprises the entire gift of the capital, so that without it there would be no gift of the capital at all. Strange that so few words, of so plain import, should occasion any legal controversy. Now, looking at the language employed, we perceive that there is no gift but in the direction, "to be divided at the end of said twenty years." All that goes before, in the residuary clause, relates exclusively to the trust in the trustees, their power and duty to sell and convert into personalty, to let, lease or demise, &c., and the payment of the income. There is no gift of the capital in any of these provisions. The form of the gift "to be divided" is peculiar, and has a special significance. It was evidently adopted to express the idea of giving distributively, and of a giving in and by the act of distribution. "*Divided*" could never be used in the case of a sole devisee; and *to be divided* is only properly used to express,

Staples and Pearce, Trustees, *v.* D'Wolf and others.

or in connection with, a future gift. We perceive, therefore, in the words of the gift, that the giving is not a present thing. We perceive that the thing directed to be done,—the *distributive giving* of the gift, is a thing not separable into parts, as though the giving could be conceived of as taking effect at one time and the distribution at another. The language does not admit of this construction. Upon this point, it is express and absolute, wholly excluding the remotest suggestion of any present gift, or of any gift possibly separable either from the time or the act of distribution. The entire thing to be done, is annexed to a specific designation of one and the same future time, at which it is to be done. At the *end* of twenty years is not at the beginning of that period, nor at any intervening time during its continuance. The end is only at the end. Whatever, therefore, is in the gift, or in the distribution, or in both, is .to take place and be effectuated at one and the same future time. This lies at the threshold. It is paramount. It is of the essence and substance of the gift. In reality, it is the gift itself, or there is no gift of the capital at all. As, therefore, the gift of the capital is embraced in, and inseparably connected with, the distribution, and the distribution is, by the paramount force of express terms, postponed to a future time, the gift is also future. *Lister* v. *Bradley*, 1 Hare, 10; *Watson* v. *Hayes*, 9 Simons, 500; *Batsford* v. *Kebbell*, 3 Vesey, 363; *Shattuck* v. *Stedman*, 2 Pick. 468; *Smell* v. *Dee*, 2 Salk. 415; 1 Jarman, 760; 2 Williams on Executors, 1059. Now I think the court will perceive, that the case at bar falls exactly within the rule of the authorities and cases cited. It appears to me to be perfectly analogous in its circumstances, and entirely identical in principle, with all the cases in which there was no gift but in the direction to pay, or to divide and pay, at a future time, or on the happening of a given event, and in all of which the vesting has been held to be postponed until the time of payment or distribution. In this case, there is no gift but in the direction, " *to be divided* " at the end of twenty years. Here, as in *Leake* v. *Robinson*, the direction, *to be divided*, was the gift. Here, as in *Smell* v. *Dee*, future time was annexed to the gift; and here is *not*, as in the exceptional class of cases mentioned by Jarman

Staples and Pearce, Trustees, *v.* D'Wolf and others.

(1 : 761), *first* a gift and *then* a direction to pay at a future time. It would seem to be plain, therefore, both from the plain, logical effect of the language, and from legal rules and principles, that this is not a vested, but future and contingent gift. *Secondly.* This conclusion will appear yet more evident, as I proceed to show that this is also an alternative gift. The gift of the capital was not to lapse or fail, as in *Smell* v. *Dee*, for want of persons to take. It was given over. Lest one class of persons might fail, another class was substituted in their places. In this respect, the gift was absolute. The testator was careful to guard against an intestacy ; but in this very care, we perceive a contingency in his mind, as to the persons who might be the objects of the gift. First in his paternal affections, and therefore nearest in claim to his bounty, were his children and orphan grandchildren, and hence they are designated as the primary objects ; but mindful of the uncertainty of life, as is shown by the clause,—— " should any of them be dead,"—he went on and designated secondary or alternative objects, of such as would stand next in claim to his bounty. The clause,—" *or their respective heirs*,"—was an express substitution of alternative objects. It was a substitution of particular alternative objects. The word " respective " refers to, and means only, the particular heirs of such as should be dead at the period of distribution. But there would have been no occasion for this clause, and it could never come into operation or have any effect, if the gift to the testator's children had not been contingent. If it had been vested in them in absolute interest, it would have gone to their respective heirs as well without this clause as with it. It was not a gift as to a class, in which survivors would take to the exclusion of legal representatives. It was given distributively, in equal distributive shares, and to each child his or her own particular share, so that if it were vested, legal representatives would have taken, each their own particular parent's share, and no law could exclude them. But however this may be, the force of the disjunctive " or," especially as connected with the clause,—" should any of them be dead,"—must be regarded as decisive. It appears to me to mark, as plainly as possible, the intent to give it over in the

contingency specified, and hence, by inevitable inference, the intent to vest only a contingent interest in those to whom it is first given. This is certainly the ordinary force and effect of " or " in disjunctive sentences, and we are not at liberty, for any slight cause, to construe the words of a testament out of their ordinary meaning. It will remain for those who deny the limitation over, and the substitution of heirs as alternative objects, to show that this decisive word may here be taken in some unnatural or unusual sense. Unless they can show this, I think it must be conceded, in the argument, that this latter clause of the gift must be construed so as to agree with and confirm the construction which I have put upon the words, " to be divided," at the end of twenty years. That I do not claim too much for the effect of " or," I will briefly refer to the case of *Gittings* v. *Mc-Dermot,* 2 Mylne & Keene, 69. The devise there was :—" I give and bequeath to the children of my sister, the late Elizabeth Wall, or to their heirs, the following sums vested in the Navy four per cent. funds," &c. On this bequest the question was raised, whether the legacies, given to such of the children of Elizabeth Wall as had died in the lifetime of the testator, had lapsed, or whether the heirs or next of kin of the deceased children were entitled, by substitution. Sir John Leach, M. R., decided as follows :—" A will speaks at the death of the testator. When, therefore, the testator gives the several legacies to the children of his sister, *or to their respective heirs,* he plainly intends that if any of the children should not be living at his death, their representatives should take by substitution. This is the effect of the word ' or,' which differs wholly from that which must have been given to the bequest had the word ' and ' been used." On appeal, the Chancellor, Lord Brougham, sustained this judgment by the following observations upon the word " or " :—" The force of the word ' or ' is not easily to be got over. Had it been ' and,' the words of limitation would of course have been surplusage ; but the disjunctive ' or ' marks as plainly as possible that the testator, by using it, intended to provide for an alternative bequest, namely, to the legatees, if they should survive ; and if not, to their heirs." But this case goes beyond

what I have need to claim for "or" in the case at bar; for, in the case cited, there was no expressed contingency of a pre-decease of the primary legatees; and the gift over, or substitution, wholly depended on the disjunctive force of "or;" whereas, in this case, "or" is immediately connected with the words, "should any of them be dead." It is true, the Chancellor takes notice of what would have been the surplusage of "heirs," construed as a word of limitation in a legacy; but that is an observation equally applicable to the word "heirs" in this case, since the effect of the direction to convert into personalty, makes this gift a gift of personalty. If, therefore, we consider that the contingency in the clause, "should any of them be dead," does not refer to the fact of dying, but only to the time of it, the argument from the disjunctive force of "*or,*" in its connection with that clause, becomes invincible. All must die at some time, but all may or may not die within a given time. The contingency in the testator's mind was,—"if his children should die within the given time of twenty years from his death; and thereupon the gift was, *to them, if they were not then dead, and if they were, to their heirs by substitution.*" That this is the proper construction of the word "or" will be yet more manifest from the absurd consequence of reading it in the sense of "and." In that case, the gift would be, "to my children *and* their respective heirs, should any of them be dead," which, in whatever sense "heirs" should be taken, whether as a word of limitation, or of purchase, or as surplusage, would be no gift at all, since, by express terms, it makes the *pre-decease* of the devisees a condition of their taking anything by it. Such a gift would be a clear nullity, and yet that would be this gift, if we should read "*or*" as if it were "*and.*" We are obliged, therefore, to construe this word according to its ordinary acceptation. I know it may be said, that I ask for "heirs" a modified use; but I answer, that if taken in its strict technical import, it would be surplusage, besides that by making the gift conditional upon the pre-decease of the devisees, it would render it a nullity. For still another reason, "heirs" could not have been used as a word of limitation,—to mark out the quantity of interest to be taken by the primary devisees, for it is only

in the event of their taking *no interest at all*, that the clause, " or their respective heirs," is to come into operation.   But if we take it as a word of purchase, a not unusual and well authorized sense, we obviate every difficulty, and impart to the entire gift a clear and consistent meaning.   On the other hand, if we take it according to its strictly technical import, we make difficulties which no construction can clear up.   It is evident, therefore, that the testator used it to designate those who *would* be his children's heirs, should any of them be dead, at the time appointed for the gift to take effect.   Whether, therefore, we consider the positive direction to the trustees to hold and occupy for the full term of the twenty years,—the clear import of futurity in the special words of the gift,—or the evident limitation over to alternative objects,—I think I am authorized to say, that it was the intent of the testator to give his children only a contingent interest in the capital of his residuary estate,—contingent upon their being alive at the period of distribution;—and that, as Mrs. Homer did not survive this period, she took no disposable interest in the gift.

III.   This is the only conclusion that agrees with the evident purpose of the twelfth clause, or with the directions regarding the distribution in the sixteenth clause of the will.   I have already remarked, that the gift of the income and the gift of the capital were altogether different.   The reason for that difference was the sole motive for the residuary clauses of the will.   To perceive the justness of this observation, we have only to consider the distinction which a prudent testator, when providing for the future well-being of his children and their descendants, would obviously make between a power to use the income, and a power to exhaust the capital.   That this testator made this distinction; that he gave to it weighty consideration, and that it was the paramount motive of this entire trust and trust term, it appears to me impossible to doubt.   He had, in prior clauses of his will, made ample provision for all his children and orphan grandchildren, by specific devises, to take effect immediately on his decease; and not desiring an accumulation of his estate, or wishing to avoid embarrassing his trustees with the cares of an

accumulation, he enlarged this already ample provision, by adding to it the income of his residuary estate, to take effect in immediate interest and enjoyment. But it was easy for him to foresee,—what in point of fact has partly come to pass,—that, through improvidence or misfortune, these rich bequests might, in a few years, all be dissipated. He could not provide against this ; but he might provide against his children and grandchildren and their heirs, in that event, coming to destitution and want. This he might do by securing for them, for such term of years as he saw fit, this residuary fund, against the liabilities both of improvidence and misfortune, and against the power of alienation ; *and he could do this in no other manner.* This, therefore, he did do, by suspending the vesting in the capital of the gift until the period of distribution, and by the contingent limitation over. And this alone explains the object of raising this trust term, and preserves for the residuary clause any consistent meaning or beneficial result. This, also, it may be here remarked, distinguishes this case from a familiar class of cases, in which possession or payment, not the vesting, is postponed on account of some convenience of the estate, as some difficulty in collecting the testator's effects, or other impediment in the settlement, or perhaps on account of some intermediate interest in a third party in the estate, or in the subject of the gift, and not, as in this case, for reasons of expediency in the gift itself, and on account of an eventual interest in ulterior devisees. But this distinction, as founded especially on the eventual interest of ulterior devisees, will more fully appear from the sixteenth clause. It was the object of this clause to direct the manner of the distribution; but I think we cannot fail to see, in the minute particularity and careful repetition of these directions, a paramount intent on the part of the testator, not merely that the heirs of his children should take their respective shares in a particular way, but rather, and more especially, that they should in reality take them ;—that no intervening circumstance should prevent their taking them ;—that their taking them, in case of the pre-decease of their parents, should be absolute, to the exclusion of all other parties, and all contingencies whatsoever.

This intent is apparent throughout the entire sixteenth clause; but even if it were not really apparent, we should be obliged to assume it, as the only way of reconciling the directions for distribution with any reasonable hypothesis, with respect to the character of the gift. The directions are, that the distribution be made in a particular way; but upon the construction of the gift claimed by the other side, it is perfectly manifest that these, or any directions for the distribution, would be altogether absurd and nugatory. Had the testator understood that he had, by the gift of the twelfth clause, vested an absolute interest in his children in the fund to be distributed, it must have occurred to him that he could have no power to direct the manner of its distribution amongst their heirs. He must have known that, in such case, his children would not be bound by such directions, but might, immediately on his decease, dispose of the entire fund by sale or otherwise, to whom, and as they pleased, and that if they should die without disposition, the law, and not his will, would direct the distribution. He must have known, also, that if he had given to his children an absolute interest in the property, the husband or wife of a deceased child would be entitled to participate in the distribution; or, rather, according to the directions for a conversion of the fund into personalty, that the husband of a deceased child might take such child's entire share. No provision is made against any of these contingencies, or against claims of creditors or assignees; and, indeed, upon the construction which I am opposing, any provision for such a purpose must have been altogether unavailing. Surely, the testator had no apprehension of these consequences, and yet he must have foreseen that they would be inevitable, if the gift had been absolute. And, again: how are we to account for the uniform use, throughout this clause, of the word "take," if it referred only to a taking by descent? It would rather seem to be used in the active sense of a taking by force of the will in the character of a purchaser, than as by an arbitrary law of distribution. In one instance, indeed, the testator uses it in connection with "receive or inherit," in the clause, "it being my intention that my grandchildren, and the heirs of my said grandchildren, and each of my

children, shall only take the portions of him, her or them, from whom he, she or they may *take, receive* or *inherit.*" But here the words, "may take, receive or inherit," if construed according to the subject-matter, which was *not how, but how much* they should take, can only mean "may have a *capacity* to take, receive or inherit." However they were to take, the shares were to be apportioned·as if they took *per stirpes.* It was one thing to make the gift, another thing to direct the manner and proportion of its distribution. In this case the distribution could not be assigned in any direct way. The distributees could not be named, or described by any personal characteristics, for they were not born. They could not be described as grandchildren simply, for the limitation extended to his grandchildren and their heirs indefinitely. Such a succession of descendants, appointed to shares in a particular way, could only be described by their capacity to take, receive or inherit in that way, according to some known law of distribution or inheritance. This was not saying *how* they should take, receive or inherit, *but how much.* When, however, the testator, in this clause of his will, says, "*now my intention is, and I therefore will,* that the children of my said children, and any one of my said children, and the heirs of my said children, and any one of my said children, shall only take the share of his, her or their parent or parents, and such portion of said residue, and the rents, issues, profits and interest thereof, *as such parent or parents would have taken if alive,*"—the inference is irresistible ; *first,* that he considered that he had a right to· direct the disposition of the residuary fund *after* the death of his children, to whom he had given it by the gift of the twelfth clause ; and, *secondly,* that, as he construed that gift, *the being alive of his children* at the period of the distribution was a *condition* of their taking anything by it, *and their not being then alive,* a contingency on which the estate should go to their respective heirs by substitution. This is the construction put upon the gift by the testator himself, and this is the construction which I put upon it.

Staples and Pearce, Trustees, v. D'Wolf and others.

*B. R. Curtis, with whom was Payne, for Mr. and Mrs. Robert L. Cutting :—*

The testator died on the twenty-first day of December, 1837. His will was proved on the twenty-sixth day of January, 1838. On the eleventh day of November, 1839, James D'Wolf, Jr., released all his interest in the residuary estate, bequeathed by the twelfth clause of the will. James D'Wolf, Jr., did not survive the end of the term of twenty years, mentioned in the twelfth clause of the will. Mrs. Cutting, one of his children, survived him, and is still living. The first question is, whether the said twelfth clause gave to James D'Wolf, Jr., a vested interest in the capital of the residue, which was to be distributed after the expiration of twenty years, or only a *contingent interest*, dependent on his being alive at the end of twenty years, the time fixed for the distribution. Or, to state the question more generally, it is, whether the children of the testator took, under this twelfth clause, as explained by the sixteenth clause, absolute interests in the capital of the residuary estate, distributable after the expiration of the term of twenty years; or, whether they took only contingent interests therein, dependent on their surviving the expiration of that term, the share of each, in case of his or her decease, being limited over to his or her heirs, as purchasers. I maintain, in behalf of Mr. and Mrs. Cutting, that the latter is the true construction of the will. The twelfth clause of the will first creates a trust *as to the income*, which is to continue for twenty years. The residuary estate is given to the executors " in trust for my aforesaid children," &c. (naming them), "*for the term of twenty years*, the rents, issues, incomes, profits or dividends *to be paid* to my aforesaid children," &c., "*for said term of twenty years*, and to be paid annually." During this term, the trustees are to hold and manage the property, and *pay its income* to his children and certain grandchildren and their heirs. Then follows the direction as to the capital,—" and, *at the end of said twenty years*, the aforesaid property or estate (*i. e.* the capital) *to be divided* equally between my said children," &c., " *or their respective heirs, should any of them be dead*, share and share alike." That is to say, at the expiration of the term of twenty years, the

Staples and Pearce, Trustees,.v. D'Wolf and others.

trust, as to the income, is to cease, and the capital, theretofore not disposed of, is to be distributed among such of his children as shall *then* be living; but should any child be dead, the heirs of that child are to take the share which would have come to the deceased child if then living. In support of this interpretation of the will, I submit the following points and authorities.

I. The testator, having positively ordered his trustees to convert all the realty, in his residuary estate, into personalty, the bequest of the capital of this residue is to be deemed a bequest of personalty only.

II. By the words, "*or their respective heirs, should any of them be dead,*" the testator intended children, if there should be children; if not, then the descendants, if any; if not, then the next of kin. Though it is an inartificial mode of designating objects of the testator's bounty, to describe them as the heirs of a living person, since, strictly speaking, no one is the heir of a person who is alive, yet, where the will itself shows that the testator knew the person was alive, a bequest to his heirs is equivalent to a bequest to his children or his next of kin. *Simms* v. *Garrott*, 1 Dev. & Bat. Eq. 393; *Bowers* v. *Porter*, 4 Pick. 198; *Ellis* v. *Essex Bridge*, 2 Pick. 243; *Heard* v. *Horton*, 1 Denio, 165; *Came* v. *Roach*, 4 M. & Payne, 862. The intention of the testator, when consistent with the rules of law, however inartificially expressed, is to govern. And if it appears by the will to have been his intention to use the word "heirs" to mean "children," or "issue," or "next of kin," it is to be so read. The sixteenth clause of the will clearly shows, that the testator did use the word *heirs* in the sense of children primarily, that is, if there should be children; and, secondarily, that is, if there should be no children to take, then he intended to designate descendants, or next of kin.

III. The testator has made the interests of his children in the *capital* of the residue contingent. 1st. His language clearly shows that a child was not *to take* if not alive at the time of distribution, and that his or her heirs were to take *as purchasers*. The language of this will certainly cannot have its natural and literal effect, unless the gifts to his children are held to be contingent, and that their children, or issue, or next of kin are to

take as purchasers. For, after saying that at the end of twenty years the property is to be divided equally between his children, he adds, " or their respective heirs, should any of them be dead," thus clearly showing he intended that, *at all events*, the heirs of a child should take, if the parent should be dead, at the expiration of twenty years. But, unless those heirs were to take as purchasers, they would not take *at all events*. Creditors or assignees would take, through the personal representatives of a deceased child, to the exclusion of his children, or issue, or next of kin; as indeed, it is now contended that such assignees do take, to the exclusion of grandchildren of the testator. 2d. To benefit the children of the first taker, where they appeared to have been contemplated by the testator as objects of bounty, the rule in Wilde's case (6 Rep. 16, *b*) was adopted, by which a devise of land to A and his children is held to give an estate tail to A, an estate tail in the parent being the only medium through which the children can take. But it is now settled, notwithstanding former doubts, that a bequest of personalty to A and his children gives only an estate for life to A, with a remainder to his children. *Audsley* v. *Horn*, 1 Law Times (N. S.), 317. *A fortiori*, a bequest to A, B and C, or their respective children, should either of them be dead at the time fixed for the gift to take effect, must be held to confer such a contingent interest upon the first takers; and that the testator used the word *heirs* to mean children has been already shown. 3d. It is a settled rule, that where there is no gift but in a direction to pay or distribute among several persons, at a future period, the vesting in interest is postponed until the expiration of that period. 2 Smith's Fearne, §§ 314, 315 ; 1 Roper on Legacies, 565 ;—where the authorities are collected. Here the testator has made no gift of the capital of the residue, except by his order to the trustees to distribute it at the end of twenty years. This alone would postpone the vesting in interest until the expiration of that term. But, in addition, the testator expressly declared, that if a child should then be dead, the child's heirs are to take, and not the child's personal representative ; and, of course, the heirs can only take personalty as purchasers. But what renders it still

more clear that it was the testator's intention that his grandchildren should take as purchasers, under the designation of heirs, in case of the decease of their parent before the expiration of twenty years, is the explanation the testator has made of his intentions, in the sixteenth clause of his will. It is manifest if they were to take from their parents, under the Statute of Distributions, they *must* take *per capita;* and that the husband or wife of a deceased child of the testator must also take from and under such deceased child, according to the rules of law. Yet it is indisputable that the testator intended, by this sixteenth clause, to regulate the manner in which the grandchildren and other heirs should take. And if he intended to do this, he must have intended they should take under the will as purchasers. Indeed, he expressly refers to their so taking when he says, "the *divisions* to be made *per stirpes* and not *per capita.*" That is, when the trustees shall divide the residue of my estate among those to whom it is given by this will, if any child shall be dead, the children of that child, or its heirs, are to take, *by force of this will*, the share which would have gone to the parent of that child, if living. Now, suppose the children did not take as purchasers under the will, but that the parents took a vested absolute interest in the capital; and that a son died, during the twenty years, leaving a widow and children: in that case, the widow would take her share, to the exclusion of the children, *pro tanto;* or, suppose a daughter died, during the twenty years, leaving a husband and children: in that case, the husband would take the whole as representing his wife. *Emerson* v. *Cutler,* 14 Pick. 108. Yet the intention of the testator is clear, to have the children take the whole, *per stirpem;* that is, as representing by substitution their deceased parent. It is true he speaks of it as *the share of the parent.* But this must be understood to mean, as indeed the will says, the share which the parent *would have taken, if alive;* and this expression also shows that, if not alive, the testator understood they were not to take; that the taking was contingent on that event. It is true, also, that the will says, that his grandchildren, &c., shall only take "the portion of his or their parent, *from whom* he, she or they may take, receive or inherit;" but it

Staples and Pearce, Trustees, *v.* D'Wolf and others.

does not say from whom he, she or they may take *the share in question;* on the contrary, he has already spoken of the share as what *would have been taken* by a child, *if living;* and if a child did not take a share in the residue because not living, his or her children could not take *that share* from their parent; they could not take from the parent what the parent never took.   The expression, therefore, must be understood to refer to the capacity to inherit, generally, and the *stirps* from which an inheritance would come, and not to an actual inheritance of this property. See *Ward and al* v. *Amory,* 1 Curtis's C. C. R. 419.   Unless he meant to make the shares of his children in the capital of the residue contingent, I do not perceive any motive for raising the term of twenty years and bequeathing it separately; for if he intended that, at all events, the capital should go to the same persons to whom the income for the term is given, why not give the capital at once to the beneficiaries?   There is a class of cases which have been decided mainly on this ground; it being considered as decisive evidence of the intention of the testator to make the bequest contingent, *that he has made a distinction between the income and the capital;* and that the income alone is the subject of the bequest, until a certain time, and the principal is then, for the first time, to be transferred to the legatee.   See Roper on Legacies, 581.   In such cases it has been held that, as respects the capital, it is not given until the arrival of the specified time, and the interest of the legatee is consequently dependent on his being then alive to take the bequest.   Having reference to both the twelfth and sixteenth clauses, the true question may be stated to be, whether the testator has not shown his intention to substitute the heirs of any child who should die before the expiration of the twenty years, in place of their deceased parent, as the objects of his bounty; and it is confidently submitted that, without overruling a long series of cases, as well as departing from the natural meaning of the language of the testator, such *substitution* must be held to have been his intention.   Some of the numerous cases are: *Girdlestone* v. *Doe,* 2 Sim. 225; *Gittings* v. *McDermot,* 2 M. & H. 69; *Vaux* v. *Henderson,* 1 J. & W. 388; *Doody* v. *Higgins,* 9 Hare, appendix xxxii;

*Jacobs* v. *Jacobs*, 17 Eng. Law and Eq. 267. Another question respects the interest and income of the fund during the term of twenty years. It is given to his children "and their respective heirs." If, for "heirs," we substitute "children," then upon the decease of any child of the testator, the children of such deceased child would be entitled to receive their parent's share of the income during the residue of the term of twenty years. *Audsley* v. *Horn*, 1 Law Times (N. S.) 317; *Jeffrey* v. *Honeywood*, 4 Mad. 398; *Crawford* v. *Trotter*, 4 Ib. 361; *Morse* v. *Morse*, 2 Sim. 458. In *Crawford* v. *Trotter*, the gift was to A and to her heirs (say "children"), and it was held A took only for life. In the case at bar, the testator meant children or descendants, as clearly appears from the sixteenth clause of his will.

*Langdell, with whom was Payne, for the widow and heirs of William Henry D'Wolf:*—

I. The twelfth clause of the will of James D'Wolf contains two distinct and independent gifts. The first is a gift of the income and profits of the testator's residuary estate, to the devisees therein named, for the term of twenty years. The second is a gift of the *corpus* or capital of the same property, to the persons therein named, to take effect upon the expiration of twenty years. The fact that the same persons were the primary objects of both gifts, though important for certain purposes, renders the gifts none the less distinct and independent.

II. The second gift in the twelfth clause, being the gift of the capital of the residuary estate, is a future and executory gift, which did not take effect, nor vest any interest in any one, until the expiration of twenty years after the death of the testator. William Henry D'Wolf not being in existence at that time, the gift to him never took effect; and in the absence of the words, "or their respective heirs should any of them be dead," his share would have lapsed, and would now belong to the heirs or next of kin of the testator. 1. The doctrine of lapse is not confined to the case where a legatee or devisee dies before the testator. There always is, and must be, a lapse, when the object of the gift is not in existence at the time appointed for the gift to take effect. It is doubtless occasioned most frequently by the death of the

object during the lifetime of the testator, since a testamentary gift never takes effect till after the testator's death. But if, for any reason, the gift is not to take effect until the expiration of a certain period after the death of the testator, or until the happening of a certain event, which may or may not happen before the death of the testator, and the object of the gift dies after the testator, but before the expiration of the period, or the happening of the event, upon which the gift is to take effect, there is just as strictly and properly a lapse as if the object of the gift had died before the testator. 1 Eq. Cas. Abr. p. 294, ch. 38, subds. (A), (B); 2 Fonb. Eq. bk. 4, pt. 1, ch. 2, § 3; 2 Williams on Executors, pt. 3, bk. 3, ch. 2, § 5, subds. 1, 2. 2. The rule that a legacy shall vest in interest immediately upon the death of the testator, or as soon thereafter as circumstances will permit, is a mere rule of construction, and not a rule of law. The time at which a legacy shall vest being a matter over which the testator has absolute control, the question is entirely one of intention. The course of events may indeed be such as to make it impossible for a gift to vest immediately upon the testator's decease; and, in that case, an intention expressed that it shall so vest, must of course become inoperative. But when the events are such that the gift *may* vest immediately upon the death of the testator, it is always a question of intention, whether it does so vest or not. 1 Jarman on Wills (2d ed.) p. 683, (1st ed.) p. 726. 3. It follows, from the proposition last stated, that it is an error to suppose that a gift to a person *in esse*, and absolute in its terms, must necessarily vest in interest immediately upon the death of the testator; that any words of futurity, in which such gift may be expressed, must refer merely to its payment, or its vesting in possession or enjoyment; and that, in order to suspend the vesting in interest, the gift must, in its terms, depend upon some contingent or uncertain event. The true rule is, that words of futurity, unaccompanied by any contingent event, will or will not suspend the vesting, according to the purpose for which the testator shall appear to have inserted them. 2 Williams on Executors (5th ed.) p. 1100, (4th ed.) p. 1051; 1 Jarman on Wills (2d ed.) pp. 711, 712, (1st ed.) pp. 759, 760; *Smell* v. *Dee*, 2

Salk. 415 ; *Bruce* v. *Charlton*, 13 Sim. 65, 68. 4. It clearly appears from the general scope of the will of James D'Wolf, as well as from the particular structure of the twelfth clause, that it was his intention to suspend the vesting of his residuary estate, until the expiration of twenty years from the time of his decease. Having already given the bulk of his property absolutely to the persons named in the twelfth clause, and intending that they and their descendants should eventually have the benefit of the residue, he, nevertheless, wished to secure the capital of such residue, for a reasonable length of time, against all contingencies. This was the object of the twelfth clause. His plan was, to give to the objects of his bounty the full benefit of the income from the time of his death, but to defer the gift of the capital for the period of twenty years. This arrangement, he supposed, would accomplish his purpose. He reasoned, very naturally, that so long as there was no gift of the capital, no one would have the power to dispose of it or control it. This explains the testator's reason for inserting the words, " or their respective heirs should any of them be dead." The leading object of the clause was, to suspend the vesting of the capital for the period named ; but a consequence of that would be, that the death of any of the legatees, in the mean time, would occasion a lapse. To obviate the effect of that, he inserted the foregoing words, giving the share of the person dying, to the same persons to whom it would have gone by law, in case it had been vested. To adopt any other view, in regard to the leading purpose of the twelfth clause, would be to attribute to the testator an intention which was futile and absurd. If he intended to give the legatees vested interests immediately upon his death, and merely to defer the possession and power of disposition for the period named, such an intention could not have been made effectual. The legatees might, notwithstanding, have demanded immediate possession of their shares, or disposed of the same at pleasure. Lewin on Trusts (3d ed.) pp. 597, 598, (2d ed.) pp. 496, 497 ; *Pearson* v. *Lane*, 17 Ves. 101 ; *Josselyn* v. *Josselyn*, 9 Sim. 63 ; *Saunders* v. *Vautier*, 4 Beav. 115 ; *Gosling* v. *Gosling*, 1 Johns. (Eng. Ch.) 262, 5 Jur. N. S. 910. 5. There is no gift of the capital of the resi-

due, except in the direction to "divide" at the end of twenty years. The words are, "and at the end of said twenty years, the aforesaid property or estate *to be divided* equally between my said children," &c. The case, therefore, comes directly within the rule, that, where there is no gift but by a direction to pay, or divide, or transfer, at a future time, the vesting will be postponed till that time has arrived. 2 Williams on Executors (5th ed.) p. 1108, (4th ed.) p. 1059. If it be said that, though there be no other gift than in the direction to divide or distribute *in futuro*, yet if such payment or distribution appear to be deferred for the convenience of the property or fund, the vesting will not be postponed (1 Jarman on Wills (2d ed.) p. 715, (1st ed.) pp. 763, 764; *Packham* v. *Gregory*, 4 Hare, 398; *In re Bennett*, 3 Kay & John. 280), we answer that this mode of stating the rule will serve our purpose equally well. The distribution, in the present case, was not deferred for the convenience of the fund, or (as it is otherwise expressed) to let in some other interest. The income was given for twenty years, *because* the gift of the capital was postponed during that period; the gift of the capital was not postponed *in order* to let in the gift of the income. In the order of cause and effect, the gift of the capital would have come first. This is obvious from the consideration that both gifts were primarily to the same persons. The gift of the income could not have been a controlling object with the testator, for there was nothing to be accomplished by such a gift, as distinguished from an immediate gift of the capital. The leading object was to postpone the vesting of the capital; and then the gift of the income, during the intervening period, followed of course, in order to prevent intestacy. 6. The rule, that a gift of the intermediate interest favors the vesting of the principal, has no application to the present case. The rule applies only to *pecuniary* legacies. A gift of interest, in the proper sense of that word, indicates that the legacy is vested, because interest is a premium or compensation for the forbearance of principal, to which it supposes a title. 1 Jarman on Wills (2d ed.) p. 718, (1st ed.) p. 766. So, also, a gift of interest indicates that the legacy is to be separated at once from the bulk of the estate;

and why such separation, unless there is to be an immediate and absolute gift? *Vawdry* v. *Geddes*, 1 Russ. & M. 208; *Saunders* v. *Vautier*, Cr. & Ph. 240, 248. Neither of these reasons has any application to a residuary gift. The rule above stated has no application when, as in the present case, the gift of the interest or income is separate and distinct, and precedes the gift of the capital. 2 Williams on Executors (5th ed.) pp. 1111, 1112, (4th ed.) p. 1062; *Batsford* v. *Kebbell*, 3 Ves. 363; *Watson* v. *Hayes*, 5 M. & Cr. 125; *In re Hart's Trusts*, 4 Jur. N. S. 1094. A distinct gift of the intermediate income, in the case of a residue, in truth furnishes an argument against the vesting of the capital; for when a residue is vested, the income is payable of course, notwithstanding the possession of the capital may be postponed. *Nicholls* v. *Osborne*, 2 P. Wms. 419; *Chaworth* v. *Hooper*, 1 Bro. C. C. 82. Especially is this so when, as in the present case, the legatee labors under no incapacity, and the income is given to him directly, and not directed to be applied for his benefit; for in such a case the gift of the income is entirely superfluous, except upon the supposition that the capital is not vested. 7. Those authorities which hold that an absolute gift to trustees, in trust for certain persons, will confer an immediate vested interest upon the *cestuis que trust*, although there be no express gift to them except by a direction to pay or divide at a future period, have no application to the present case. The reason upon which they proceed is, that the general declaration of trust, which precedes the direction to pay or divide, contains, by implication, an absolute gift of the beneficial interest. And this reason is much strengthened, when it can be inferred that the reason of withholding the possession of the capital is the infancy, or other temporary incapacity, of the legatee. *Booth* v. *Booth*, 4 Ves. 407; *Saunders* v. *Vautier*, Cr. & Ph. 240; *Hanson* v. *Graham*, 6 Ves. 239, 248. In the present case there is no absolute gift to the trustees, but only a gift for the term of twenty years. The gift to them is indefinite in form, but it is immediately followed by a declaration of trust for the term of twenty years; and the trust being to continue no longer, the trustees will be held to take a legal interest only commensurate with their trust. But however

this may be, it is certain that no trust is declared in connection with the gift to the trustees, except for the term of twenty years. The words are: "in trust for my aforesaid children," &c., "for the term of twenty years." This is wholly separate and distinct from the subsequent direction to divide the capital at the end of twenty years. Therefore, there is no gift whatever, legal or equitable, of the capital of the residue to the persons named, except in the direction to divide. 8. The present case is not within the rule, that a residue shall vest immediately upon the death of the testator, unless there is a very clear intention to the contrary, making a distinction, in this respect, between a residue and a pecuniary legacy. The reason of the rule is, that intestacy may be the consequence of holding the bequest of the residue contingent; and every intendment is to be made against holding a man to die intestate, who sits down to dispose of the residue of his property. 1 Jarman on Wills (2d ed.) p. 722, (1st ed.) p. 767, 768; *Booth* v. *Booth,* 4 Ves. 399. But in this case there can be no intestacy, because the testator, by the words, "or their respective heirs, should any of them be dead," has expressly provided against that contingency. We are now, it is true, considering the effect of the gift independently of those words, but it is convenient to refer to them here for this incidental purpose.

III. Assuming that, in the absence of the words, "or their respective heirs, should any of them be dead," the share of William Henry D'Wolf would have vested absolutely immediately upon the death of the testator, still those words rendered it *contingent* upon his surviving the twenty years, or, at all events, *defeasible* in the event of his dying within that period. If the words had been, "or the survivors of them, should any of them be dead," no one would have raised a doubt as to the construction. *A fortiori,* if the property had been given to strangers, in the event of deaths occurring, there would have been no doubt. The whole difficulty arises from the gift being to the heirs of the persons dying. But there is really no difference whatever, in a case like the present, between a gift to heirs and to any other persons. The testator used the word "heirs" as a word of purchase, and not as a word of limitation. Words of limitation

Staples and Pearce, Trustees, *v.* D'Wolf and others.

must always be preceded by words of purchase, marking out the objects of the gift. When the word "heirs" is used as a word of limitation, it follows a gift to the ancestor, and is used to designate the quantity of interest which the ancestor is to take. Smith on Executory Interests, §§ 403, 404; Fearne on Cont. Rem. (Butler's ed.) p. 79. It is obvious that the word "heirs" was not used for that purpose in this instance, for it has no reference to, or connection with, any preceding gift to the ancestor. There is, indeed, a previous gift to the ancestors for twenty years, but the word "heirs" occurring in the connection now adverted to, has nothing to do with that gift. So, too, there is a previous absolute gift to the ancestors in a certain event; but in that event the words, "or their respective heirs, should any of them be dead," are entirely inoperative. They only become operative in the event of the previous gift to the ancestors not taking effect. The intention of the testator, in regard to the use of the word "heirs," is not controlled by any rule of law. The rule, that a devise to the testator's own heirs of the same estate that the law would have given them is inoperative, the heirs being in by descent, has nothing to do with the case. 4 Kent's Com. 506; *Ellis* v. *Page*, 7 Cush. 161. The rule in Shelley's case is inapplicable. By that rule, "where an estate of freehold is limited to a person, and the same instrument contains a limitation, either mediate or immediate, to his heirs or the heirs of his body, the word *heirs* is a word of limitation; *i. e.*, the ancestor takes the whole estate comprised in this term. Thus, if the limitation be to the heirs of his body, he takes a fee tail; if to his heirs general, a fee simple." 2 Jarman on Wills (2d ed.) p. 273, (1st ed.) p. 241. By the word limitation, as used in the above citation, is to be understood a limitation by way of remainder, as distinguished from an executory devise, which, though limited to the heirs of a person taking a previous estate of freehold, vests in the heirs as purchasers. 2 Jarman on Wills (2d ed.) p. 273; Fearne on Cont. Rem. (Butler's ed.) p. 276. It is obvious, from the foregoing definition, that the rule in question has no bearing upon the present case. No estate of *freehold* was given to the ancestors, and the limitation to the heirs was not a *remainder.* Whether

Staples and Pearce, Trustees, *v.* D'Wolf and others.

the rule is not inapplicable for other reasons, also, it is not necessary to inquire. Whether the testator used the word "heirs" in its strictly legal sense, or as a mere *designatio personarum*, is not material. It is equally a word of purchase, in whatever sense it was used. It is only when a case comes within the rule *in terms*, that it is necessary to show that "heirs" was used as *designatio personarum*, in order to make it a word of purchase. Instances are common of gifts to "heirs," without any preceding gift to the ancestor, and in which the word is held to have been used in its legal sense; yet it was never doubted that it was, in such cases, a word of purchase. 2 Jarman on Wills, ch. 28, *passim; Vernon* v. *Wright*, 7 Ho. L. Cas. 35. Nor can it be said that the direction to divide has reference only to the possession and control of the property bequeathed, the same having been vested in interest by a previous part of the clause; and, therefore, that the word "heirs" is not a word of purchase. We have already shown that there is no gift of the capital of the residue to any one, except in the direction to divide. If this does not constitute a gift to the heirs in one event, neither does it to the ancestor in the other event. The argument, therefore, proves too much. If the preceding part of the twelfth clause had contained the word "forever," instead of the words "for the term of twenty years," yet the subsequent words, "or their respective heirs," &c., would have constituted a new gift to the heirs in the event named, thereby qualifying and making defeasible the previous absolute gift. *Christie* v. *Phyfe*, 22 Barb. 195, 19 N. Y. 344.

IV. Having shown that William Henry D'Wolf, in the events which have happened, acquired no interest in the *corpus* of the residuary estate, it follows, of course, that the share which he would have taken, had he lived, has become vested in his heirs as purchasers. By the words, "or their respective heirs," &c., the persons answering that description were *substituted*, as the direct objects of the testator's bounty, in the event of the ancestor's dying before the expiration of twenty years. Indeed, it is conceived that the heirs of William Henry D'Wolf might rely, with implicit confidence, upon the single proposition just stated. It is not only the unavoidable result of the plain and unambig-

Staples and Pearce, Trustees, *v.* D'Wolf and others.

uous language of the will, but it is supported by authorities which place it beyond doubt. *Girdlestone* v. *Doe*, 2 Sim. 225 ; *Gittings* v. *McDermott*, 2 M. & K. 69 ; *Price* v. *Locksley*, 6 Beav. 180 ; *Doody* v. *Higgins*, 9 Hare, app. xxxii ; *Jacobs* v. *Jacobs*, 16 Beav. 557 ; *In re Craven*, 23 Ib. 333.

V. The conclusions hitherto drawn from the twelfth clause, are strengthened and confirmed by the sixteenth clause. The direction, that the heirs of his children shall only take such portion of the residue as the parent would have taken if alive, the division to be made *per stirpes* and not *per capita*, shows conclusively that the heirs were to take directly under the will, and not through their ancestors. Upon any other construction, this direction would be utterly absurd and unmeaning. If the testator's grandchildren were to take by descent from their parents, they would, of course, take *per capita ;* children can only take *per stirpes* when they take from some other person than their parent, *as representing their parent.* This argument is so conclusive, that it has been held to make the word "issue" a word of purchase, in the ordinary case of a gift " *to A and his issue,*" where the word "issue" would otherwise undoubtedly be a word of limitation. 2 Jarman on Wills (2d ed.) p. 487 ; *Hedges* v. *Harper*, 9 Beav. 479 ; *Dick* v. *Lacy*, 8 Beav. 214. The words, "from whom he, she or they may take, receive or inherit," do not militate against the construction for which we contend. The testator meant merely to say, that the heirs of his children should only take the shares of the persons whom they *represented.* This is clear from his directing that they should take *per stirpes ;* and the proper word for expressing his meaning not occurring to him, he used those quoted above. That he was in doubt, as to the proper word, is evident from his using three to express the same thing. They amount, at most, to an inaccurate reference to a clear and unambiguous gift, and, therefore, according to settled rules, they cannot affect its construction. 2 Jarman on Wills (2d ed.) p. 679, (1st ed.) p. 742, rule xii.

BRAYTON, J.* The question propounded to us and argued is,

* Judges Brayton and Shearman alone sat in this cause; the Chief Justice having been formerly of counsel for the trustee of the residue; and Justice Bullock, the owner, by purchase, of a share in it.

Staples and Pearce, Trustees, *v.* D'Wolf and others.

whether an interest in the capital of the residuary estate vested, absolutely, in the legatees named and described in the twelfth clause of the will, upon the death of the testator, to be divided and distributed among them at the end of twenty years? or, whether the interest in that residue was contingent, and dependent upon the legatees being alive at the end of twenty years?

The law favors the vesting of estates; and, when a gift is made to a person *in esse*, it passes to the legatee, as a vested interest, immediately on the death of the testator. Jarman on Wills, 727; 2 Williams on Executors, 1051; 1 Roper on Legacies, 557. And if there be a prior gift created, determinable upon an event certain to take place, and there be a gift over upon such determination, the last gift will vest with the first, and it will be held that the possession and enjoyment of the gift is postponed, but not the gift itself. 1 Jarman, 727. It is, however, a question of intent, to be gathered from the whole will, and the construction might be varied, if, from other parts of the will, it appeared that the testator intended that the gift itself should not take effect until the happening of some event in the future; and the question is always,—is futurity annexed to the substance of the gift? if so, the vesting is postponed; or is it annexed to the time of payment only? if so, the legacy vests immediately. 1 Jarman, 759, 760. And if the gift be expressly to A, and expressed to be payable or to be paid at a certain time, time is held to relate to the payment only, and not to the gift itself, and it confers a vested interest on the testator's death.

The gift here is of all the remainder of the testator's estate, real and personal. It is given to the executors, and it is declared that they shall hold it in trust for the legatees "and their heirs." The gift begins with this declaration; and it is further directed, that they shall hold it in their own possession, receiving the rents and profits and income thereof for the term of twenty years, during which time they shall annually pay to these legatees "and their respective heirs," all the income so received; and, at the end of twenty years, shall pay and divide all this residue, the capital, among the same legatees. It is further directed that they shall, in the meantime, lease for such time, and upon such

terms as they think best, and, at such time as they may deem best, sell and absolutely dispose of all the property and convert it into money. To enable them to do this, they must have the fee simple in the whole. Hill on Trustees, 242; *Villiers* v. *Villiers*, 2 Atk. 71; *Oates* v. *Cook*, 3 Burr. 1684; *Gibson* v. *Lord Montfort*, 1 Ves. Sen'r, 485; 2 Jarman on Wills, 204. We may ask here, as did Wigram, Vice Chancellor, in *Leaming* v. *Sherrat*, of what were they trustees?—and we may give the same answer: of the whole residue. And if we ask, again, for whom are they trustees?—the answer may properly be: for all the legatees, as the testator has declared, "for them and their heirs;" no others are named. The trustees hold for them from the death of the testator.

In *Booth* v. *Booth*, 4 Ves. 399, the residue was bequeathed to trustees, in trust to pay dividends equally between testator's nieces, B and C, until their respective marriage, and from and after their marriage respectively, to pay them their respective moieties, and it was said this was equivalent to saying, in trust to pay dividends, &c., until the marriage, and then to transfer the principal; it was to be a vested interest to come into possession on the marriage. In *Packham* v. *Gregory*, 4 Hare, 396, the residuary personal estate was given to trustees to sell and invest, and to pay the interest to testator's wife, during widowhood, and upon her death to pay and divide the whole trust fund equally among all his nephews and nieces, share and share alike. It was held that the shares of the nephews and nieces vested, and that the share of one of these who died before the tenant for life, passed to his representative. See also *Barnes* v. *Allen*, 1 Bro. Ch. Cas. 161. Sir William Grant, in *Leake* v. *Robinson*, 2 Merrivale, 385, commenting upon the case of *Booth* v. *Booth*, says, the whole interest was given absolutely in that case, a circumstance which has always been held to furnish a strong presumption of an intention to vest capital.

The rule of interpretation, referred to by counsel, can hardly apply to the present case, since the whole is here given to trustees for these legatees, and for them only. Had the gift been to these legatees "and their heirs," without the interposition of the

trust, the gift must have been construed to be absolute. Roper on Legacies, 88. That a trust is interposed does not prevent the gift from vesting, in interest, in the *cestui que trust.* The rule referred to is, that where the gift is to be implied only from the direction to divide or pay, or to transfer at a future time, the vesting will be postponed to such time, unless the contrary appear from other expressions of the testator, implying a postponement of the possession only, and not the vesting. Williams on Executors, 1059. This is the gift of a *residue*, and the rule is, that such gift will be construed to be vested; and it is said that, in such case, a very clear intent must be shown to postpone the vesting, because intestacy would often be the consequence of a lapse of such gift, and always may be. It was said by V. C. Wigram, in the case of *Leaming* v. *Sherratt*, alluding to the argument in that case, and that the legatee could not claim, unless he were living at the time prescribed for payment or division, that "questions have been made whether the simple case of a direction to pay at a future time without any gift, independently of the direction, it would be transmissible, and the court have sometimes considered the time as annexed to the legacy, but there was no intent to decide that the gift of a legacy under the form of a direction to divide at a future time, or upon a given event, is less favorable to vesting than a simple bequest of a legacy at such future time or upon a like event. The question in all such cases is, whether the testator intended it as a condition precedent that the legatee should survive the time appointed." He further said that "any case which holds that a gift of a residue to the testator's children, upon an event which afterwards happens, does not confer upon them a transmissible interest, merely because they died before that event, must be at variance with the authorities."

Another circumstance from which an intent to vest may be implied, notwithstanding the only gift is in the direction to pay in the future, is that the intermediate interest of the legacy is given to the same person. In such case the implication is that the legatee is to have the principal at all events, and this because for the purposes of interest the principal is at once set apart from the

bulk of the property. Williams on Executors, 1060 ; Fearne Cont. Rem., Butler's notes ; *Fonereau* v. *Fonereau*, 3 M. & K. 645 ; Jarman, 766 ; *Knight* v. *Knight*, 2 Sim. & Stu. 490. In the case of *Jones* v. *Mackilwain*, 1 Russ. 220, where the testator gave the residue of his estate, real and personal, to trustees upon trust for sale, and to hold one moiety of the proceeds on trust to pay and apply the same toward the maintenance and education of any and every child of his daughter, until they severally attained the age of twenty-one years, and, upon their severally attaining that age, to pay unto and amongst them said moiety, share and share alike, it was held that the several shares vested in the children before twenty-one, so as to pass to their representatives on their death. And Lord Gifford relied upon the fact that it was a residuary gift, and that the yearly income, until the time appointed for distribution, was given to the children to whom the principal was directed to be afterwards paid. See, also, *Saunders* v. *Vautier*, 1 Cr. & Ph. 240. The intermediate interest here is given to the same persons to whom the principal is to go. There is, in this case, no gift over of any share, in the event of any of the children dying without issue. For want of such gift over an intestacy might be produced, an event which the testator could not have intended ; and in the events which have happened, one share of this residue, unless it be held to have vested before the expiration of the twenty years, has, by the death of Mrs. Dodge without issue, lapsed, and thereby an intestacy, as to that share, has occurred. All these circumstances are enumerated in *Jones* v. *Mackilwain*, as existing in that case, and given as reasons for holding the capital vested. The Vice Chancellor said : " The whole interest and corpus is given, one way and another, to the children ; the dividends to the trustees for their use till twenty-one, and then the principal is given them. It is the gift of a residue, and it is the only residuary clause. It is given to trustees absolutely. It is a gift to them for the benefit of the children till twenty-one, and at that age the principal is to go to them. There is no gift over in the event of their death. They took vested interests, though they did not attain twenty-one."

There remains another question, viz. : whether a gift already

vested in the legatee upon his surviving the testator, and which would, under our statute, have gone in case of his death before, to his heirs, if he left any lineally descended, was made defeasable upon the event of his dying before the period of distribution, leaving such heirs.   It is claimed for the children of those who died before the expiration of the twenty years, that, by the words "or to their respective heirs should any of them be dead," the testator intended that such heirs should take at all events, and that if any child should die leaving children or descendants, such children should be substituted to such deceased child as to his or her share.   The strong tendency of the modern cases is, to construe the word "or" as introducing a substituted gift in the event of the first legatee dying in the lifetime of the testator, and to prevent a lapse.   1 Jarman, 453.   Though this tendency be strong, it is not conclusive, and the intent must be ascertained from the whole will; and it must be remembered that the testator had declared that the capital should be to his executors in trust for these legatees and their heirs; that, for twenty years, the income should be divided annually among them and their heirs, giving them an absolute interest.   Did he, by this language, design to make it defeasable, and that the children of the legatees should take at all events, if there were children? and were they special objects of his bounty?   There is nothing in the preceding part of the clause to indicate that he so regarded them.   There is no provision in any other clause for the children of any child then living, except that which devises to the separate use of two married daughters, to the exclusion of their husbands, and if the testator designed that such should take this residue, it is against the general spirit of this will.   We naturally ask, if such was his intent, why did he not also provide for the case of one dying without issue, and give it over to the issue of the others, and not leave it to pass to his personal representatives?

The sixteenth clause of the will is supposed to throw much light upon the meaning of the twelfth, and it is invoked with equal confidence on either side.   The testator seems to have apprehended that, from the language used in the twelfth clause,

Staples and Pearce, Trustees, *v.* D'Wolf and others.

some conclusion might be drawn that he had designed a disposition of the residue different in some respects, which he does not state, from any which he actually intended, and to have been anxious to exclude any such conclusion. It may be he apprehended some such inference from the use of the words "share and share alike." But whatever it was, this clause was intended to remove it. The clause begins with a statement of the mode in which the testator understood he had disposed of the residue, the principal, viz. : so that the income should be divided equally and among "my children, my grandson and the children of my daughter, Mary Ann, taken collectively, and to their heirs," using here no words of substitution, or words indicating that a substituted gift was or had been contemplated. He says nothing here of division of capital, but it is evident, from what follows, that he supposed he had directed the division of the capital in the same way, for he proceeds to give the same explanation as to both, and says that he does not mean that the children or heirs of his children, or any one of them, should take more than, or other than, the share of their parents, or which the parent would take, that is possess, if living, and only the portion of the person from whom they take or inherit. He declares that the divisions are to be made *per stirpes* and not *per capita.* In the twelfth clause he had called the share given to the children of his daughter, Mary Ann, "their mother's portion." He seems to have contemplated a division of his estate into ten shares, that being the number of his children, including those then living and those who had deceased, leaving children, and to have regarded each child as a *stirps* or stock of descent. Without, as we think, infringing any settled rule of construction or any series of authorities, and looking at the intent of the testator as collected from the whole will, we are of opinion that the several shares in the residuary estate vested in the several legatees, on the death of the testator, absolutely in fee simple, to be paid out and divided amongst them at the end of twenty years ; and that the heirs or children of such as might die before the expirati of that time were not to be substituted to the parent. interest which the legatees took, therefore, was an interest

was assignable during their lives, devisable by their last wills and testaments, and, upon their dying without issue, transmissible to their representatives. The result is, that none of the children of any of the legatees are entitled to claim any portion of this residue as purchasers; that the share of James D'Wolf, Jr., having been assigned in his lifetime to the trustees of the fund, for the benefit of the other *cestuis que* trust, is sunk into that residue; that the share of Mrs. Lovett, having been assigned by her in her lifetime to J. R. Bullock, and by him to the trustee for the benefit of the other *cestuis que* trust, is also sunk into the residue, and that the shares to be divided are thus reduced to eight. Of these, the children of the testator's daughter, Mary Ann, are entitled to one share; James F. D'Wolf is entitled to one share, subject, however, to a mortgage made to Henry Wardwell; the legal representatives of Mark Anthony D'Wolf, deceased, whose executors are Sophia C. V. D'Wolf and Byron Diman, to one share; the legal representatives of William Bradford D'Wolf, whose executors are Mary R. D'Wolf and William R. Taylor, to one share; the legal representatives of Nancy B. Homer, whose executor is Franklin Evans, to one share; the legal representatives of Harriette D'W. Hall, whose executor is Charles E. Butler, to one share; Byron Diman, the assignee (through Mark A. D'Wolf) of William H. D'Wolf, to one share; subject, however, to the lien by mortgage made by said William Henry to the Bank of Bristol on one-eighth of the stock in said bank; Andrew J. Davis, assignee of Catharine Davis, through Hatch, to the remaining share; subject to a mortgage to Joseph Smith, whose executors are Charles Smith, James M. Eddy and Nathaniel P. Smith; and to a mortgage to Mark A. D'Wolf, deceased; and to a mortgage to Joseph M. Blake, now held by William Bradford; and the New Hope estate has ceased to be trust property, having been conveyed, with the assent of all parties interested, to Mark Anthony D'Wolf.